In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3673

YAN LIN,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A 98 997 626

SUBMITTED JUNE 29, 2011*—DECIDED AUGUST 30, 2011

Before COFFEY, FLAUM, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Yan Lin left her home in
China's Fujian province to seek asylum in the United
States based on allegations that family-planning

---

* We granted petitioner's unopposed motion to waive oral
argument. Thus, the petition for review is submitted on the
briefs and record. *See* Fed. R. App. P. 34(f).

authorities forced her to have an abortion. An immigration judge ("IJ") denied the application, concluding that, although Lin credibly testified to having an abortion, she failed to establish that it was involuntary. The IJ's assessment of Lin's credibility turned on Lin's submission of hospital certificates that purportedly documented her forced abortion, which, he concluded, suggested that the procedure was actually voluntary. The Board of Immigration Appeals affirmed that decision. It agreed with the IJ that, absent other evidence explaining the certificates, our reasoning in *Huang v. Gonzales*, 453 F.3d 942 (7th Cir. 2006), a case which also involved the validity of a Chinese abortion certificate, justified the adverse credibility finding. We conclude that the Agency overstated our holding in *Huang* and in doing so provided an incomplete and unsupported assessment of Lin's credibility. We therefore grant the petition for review.

At her hearing before the IJ, Lin described the circumstances leading to her abortion. She testified that, in 1992 when she was 20 years old, she moved in with her boyfriend and soon became pregnant. She decided to keep the baby even though Chinese law forbade unmarried women to have children, and after a few months, Lin's parents were warned that their salaries would be cut if Lin refused to terminate the pregnancy. Despite this threat, Lin still wanted to keep the baby, so she took sick leave from her own job at a movie theater and moved to the countryside to stay with her grandmother. But these efforts to evade authorities were unsuccessful; four family-planning officers discovered Lin at her grandmother's house when she was nearly six

months pregnant. She tried to flee, and when that failed she begged the officers to leave her alone. The officers ignored her pleas and forced her to accompany them to a hospital that was about an hour from her grand-mother's home. At the hospital, doctors examined her, and she was then locked overnight in a room with other women. The next morning someone at the hospital forced Lin onto an operating table and gave her an injec-tion in her stomach. Sometime the next day she began to experience contractions, and after hours of labor, the premature baby was stillborn. Her family took her home two days later.

Lin also told the IJ about the emotional and physical consequences of her abortion. She testified about debil-itating depression, strained personal relationships, and an inability to keep a steady job. Although the IJ would conclude otherwise, Lin testified that she was not allowed to return to her job at the movie theater after the abortion. And her situation deteriorated more beginning in 1997 when she experienced an ectopic preg-nancy, which she says doctors attributed to a mistake in the abortion procedure five years earlier. At that point she learned that it would be difficult for her to have children in the future; with this news, her boy-friend abandoned her, and potential suitors refused to consider marrying her. These events, Lin said, prompted her to seek asylum in the United States.

Lin corroborated her claim of a forced abortion with two types of evidence. She attached a letter from her mother confirming her version of events as well as two

documents that she said were issued by the hospital. One of those documents was an outpatient medical record from the Lianjiang County Red Cross Hospital stating that the procedure was "due to pregnancy without marriage." The other document was a "disease certificate" bearing insignia from the same hospital, stating that her "diagnosis" was abortion. Neither document specifies whether the procedure was voluntary; they merely state that Lin had an abortion and recommend two months of bed rest. Lin testified that the hospital supplied these documents as a matter of course, not on request, when she was discharged.

In response to these hospital documents, the government submitted the State Department's 2007 country profile of Chinese asylum claims. That profile says the United States Embassy is "unaware of any so-called 'abortion certificates'" and that it knows of no circumstance where Chinese women received certificates after a forced abortion. It adds that "[a]ccording to Embassy officials, the only document that might resemble and be confused with such a certificate is a document issued by hospitals upon a patient's request after a voluntary abortion." That certificate, the report explains, would aid a Chinese woman's request for time away from work following a voluntary abortion.

The IJ denied Lin's request for asylum after determining that she was not entirely credible. He noted that, although Lin's testimony that she had an abortion was "100 percent accurate" and her description of her relationship with her boyfriend was "extremely credi-

ble," he nonetheless disbelieved her contention that the procedure was involuntary. The IJ concluded that he was compelled to disregard Lin's otherwise credible testimony because she had submitted an abortion certificate from the hospital that performed the procedure. The IJ reasoned that the certificate, when coupled by the State Department's understanding that such certificates exist only in cases of voluntary abortions, destroyed the credibility of Lin's assertion that the abortion was forced. The IJ also found that Lin could have returned to her position at the movie theater and added this factor as further evidence that Lin's abortion was voluntary. And most significantly, the IJ told Lin that, even though he didn't want to send her back to China, he had to deny her request for asylum "as a matter of law" because of our decision in *Huang,* which the IJ thought "directly contradicted" her claim. In *Huang* the IJ relied on a similar abortion certificate and the same comments from the State Department as the basis for discrediting the petitioner's testimony that his wife had been subjected to an involuntary abortion. *Huang,* 453 F.3d at 944. We upheld the decision and reasoned that the abortion certificate and the country profile together provided substantive evidence that the abortion was not forced and that "without additional corroborating evidence, the IJ was entitled to find [the petitioner's] testimony implausible." *Id.* at 947.

The Board affirmed the denial of Lin's application for asylum. It did not rely on the IJ's findings that Lin could return to her previous job at the movie theater (a correct decision since the IJ's conclusion on this point

appears to stem from a misunderstanding of Lin's testimony), but it did agree with the IJ that the reasoning in *Huang* supported the adverse credibility finding. The Board also endorsed the IJ's decision because Lin failed to "provide adequate corroborating evidence to contradict the 2007 profile."

Lin's overarching contention on appeal is that the IJ erred in concluding that our decision in *Huang* required the denial of her application for asylum. Lin primarily challenges the IJ's analysis, but the Board adopted and supplemented that decision, so we review both. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010). Lin's claim is fundamentally a challenge to the Agency's adverse credibility finding, which we must defer to if it is "supported by specific, cogent reasons that bear a legitimate nexus to the finding." *Toure v. Holder*, 624 F.3d 422, 429 (7th Cir. 2010) (internal citation and quotation marks omitted). The credibility finding fails to satisfy even this highly deferential standard because it is based on an inaccurate understanding of circuit precedent. *See Torres v. Mukasey*, 551 F.3d 616, 626 (7th Cir. 2008).

We start with the IJ's decision. Like the Board, we set aside the IJ's erroneous conclusion that Lin was able to return to her job at the movie theater after her abortion because nothing in the record supports this conclusion; the only testimony was to the contrary. Once we set aside this conclusion, the only remaining reason the IJ gave for disbelieving Lin's claim was that our decision in *Huang* compelled him to do so. But that

reason cannot be characterized as "cogent" because it overstates the holding in *Huang.* Although we upheld in *Huang* the IJ's decision to consider an abortion certificate as substantive evidence that could adversely affect an applicant's credibility, that decision was not an edict requiring an adverse credibility finding in every case involving an abortion certificate. In fact, we explicitly allowed for the possibility that the negative inference of the certificates could be overcome with "additional corroborating evidence." *Huang*, 453 F.3d at 947. As an example of the type of evidence that might suffice, we noted that Huang, whose wife had allegedly suffered an involuntary abortion, would have had a "stronger and more sustainable" claim if he had provided a supporting affidavit from his wife, who would have had first-hand knowledge of the abortion. *Id.*

Thus, instead of viewing *Huang* as a decision *mandating* an adverse credibility finding in Lin's case, the IJ should have treated it as an invitation to assess whether Lin, despite her first-hand knowledge of the circumstances of her own abortion, could be required to provide additional proof that she suffered a forced abortion. Of course, the IJ didn't need such an invitation because, under the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005), he was permitted to require Lin to supply corroborating evidence as long as the evidence was reasonably obtainable. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Krishnapillai v. Holder*, 563 F.3d 606, 618 (7th Cir. 2009). Besides her own detached and apparently credible testimony on the matter, Lin did provide one piece of corroboration in the form of a letter from her mother, but

the IJ failed to acknowledge this evidence or consider what additional information Lin might reasonably have supplied. This shortcoming in the IJ's analysis appears to stem from the mistaken impression that, in light of *Huang*, no amount of corroboration would have been sufficient to rebut the negative inference of the abortion certificate.

The IJ's rote application of *Huang* to Lin's case is also problematic because it suggests that an IJ may base an adverse credibility finding on country reports alone. We have repeatedly condemned this sort of over-reliance on generalized statements of country conditions. *See, e.g.*, *Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) (cautioning against use of generalized reports to contradict witness's specific testimony); *Galina v. INS*, 213 F.3d 955, 958-59 (7th Cir. 2000) (concluding that agency erred in giving conclusive weight to State Department report). Here, Lin correctly points out that the State Department cannot comprehensively assess conditions throughout China, so the Embassy's lack of familiarity with any hospital issuing abortion certificates following a forced abortion cannot rule out the existence of such a practice, particularly dating back to 1992. Our decision in *Huang* acknowledges this limitation in the country reports. We noted that the reports are "not as well-researched or informative as we might wish," but nonetheless recognized their usefulness as evidence tending to suggest that "a certificate shows only a voluntary abortion." 453 F.3d at 947. But that is all the report is—evidence. Neither the country report nor our decision in *Huang* to uphold an IJ's use of the country

report can be sufficient to destroy an asylum applicant's credibility as a matter of law. Because the IJ mistakenly attributed this level of significance to our decision in *Huang* and, by extension, to the State Department's report, we cannot conclude that his credibility finding was supported by substantial evidence.

The Board's decision does nothing to materially change our view of the IJ's overall credibility finding. The Board adopted the IJ's reasoning, and added that the adverse credibility finding was justified because Lin failed to provide corroborating evidence to contradict the State Department's interpretation of the abortion certificate. But as we alluded to above, the Board may require corroboration only when it is reasonable to do so. *Krishnapillai*, 563 F.3d at 618. Here, Lin provided an affidavit from a family member to corroborate her own testimony. We cannot envision other readily available evidence that might have helped prove the forced nature of her abortion, especially when the IJ found her testimony about her strenuous efforts to avoid the abortion as being credible. Also, the Board did not identify any such evidence that it found lacking. In order to deny Lin's claim for asylum based on a lack of sufficient corroboration (beyond the mother's letter), the Board needed to both explain why it was reasonable to expect further corroboration and account for Lin's failure to provide it. *Tandia v. Gonzales*, 487 F.3d 1048, 1054-55 (7th Cir. 2007). Neither the Board nor the IJ considered either of these factors, so the Board's additional reasoning that Lin failed to corroborate her claim is insufficient to justify the decision to deny asylum.

Because the Agency's credibility determination was based exclusively on an over-broad understanding of our decision in *Huang*, we cannot uphold the denial of asylum as being supported by substantial evidence. We therefore VACATE the Board's order and REMAND for a fresh assessment of Lin's credibility.